# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56817-9-II |
| Respondent, | |
| v. | |
| EDDIE HERSHELL WEST JR., | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. — On October 23, 2020, police responded to a shooting outside a Tacoma bar. Subsequent to the shooting, Eddie Hershell West Jr. exited the bar and officers instructed West to leave the active crime scene. After walking away from the scene, West realized he was going the wrong direction and began walking back towards the scene. Officers again instructed West to walk away. After a verbal exchange, an officer placed West in an escort hold in an attempt to remove West from the scene. West broke free of the hold and punched several officers. Although the bar had surveillance cameras pointed in the direction of the incident, officers did not collect or preserve surveillance video evidence of the incident involving West. West was subsequently charged with three counts of third degree assault.

We hold that (1) the trial court did not err in denying West's motion to dismiss for governmental misconduct, (2) West did not receive ineffective assistance of counsel where counsel did not request a missing evidence jury instruction, and (3) the prosecutor's statement referring to

defense counsel as an "illusionist"[1] does not rise to the level of prosecutorial misconduct requiring reversal. Accordingly, we affirm West's conviction.

FACTS

1. *Background*[2]

On October 23, 2020, police responded to a shooting at a Tacoma bar. When police officers arrived at the bar, a large crowd of patrons were leaving the chaotic scene. Once on scene, officers found a gunshot victim outside the front door of the bar.

Eddie Hershell West Jr., a 46-year-old African American man, was at the bar that evening to play pool and have a couple of drinks after work.[3] After hearing the gunshot, West remained inside the bar while other patrons scattered. West exited the bar after 10 or 15 minutes. Multiple officers instructed West to walk away and stay out of the crime scene. West walked away, but when he realized he was walking in the wrong direction, he walked back towards the scene. Officer Trent Dow again instructed West to leave the scene. West attempted to explain that he was not from the area and was trying to figure out how to leave.

Officer Brynn Cenicola[4] observed West's interaction with Dow. Cenicola explained that initially, she thought West was just mumbling incoherently but that as West got closer to the officers she could more clearly hear him making threats. Cenicola attempted to deescalate the

---

[1] 4 Verbatim Report of Proceedings at 667.

[2] The following facts were compiled from testimony during West's jury trial.

[3] West had been drinking at home earlier in the evening.

[4] At the time of the incident, Officer Cenicola's last name was Cellan. Portions of the record refer to Cenicola as Cellan. This opinion reflects Cenicola's name following her name change.

situation. Cenicola instructed West to step back while officers helped the gunshot victim. Initially, West nodded and complied by taking a few steps back; however, after a moment's pause, West re-approached the officers.

After observing West's interaction with Dow, Officer Logan Breskin joined Cenicola in approaching West. Breskin and other officers repeatedly asked West to leave the scene but West reacted in a confrontational manner, vaguely stating he was going to "beat" the officers up. 2 Verbatim Report of Proceedings (VRP) at 297. Breskin's goal was to process the scene of the shooting and to remove West from the crime scene. Breskin ultimately grabbed West and used an "escort technique" to remove West from the scene. *Id.* at 300. While Breskin attempted to escort West from the scene, West pulled his arm free of Breskin, leaned back, turned and punched Cenicola in the face. West then tried to hit Breskin. Breskin, aided by Officer Steven Miller, pushed West to the ground.

Once on the ground, West struck Breskin and Miller. West struck Breskin with a closed fist, in the jaw and ear. West also repeatedly punched Miller in the head and jaw. Breskin explained that he responded with force, striking West "multiple times with [a] closed fist." *Id.* at 308. In an attempt to stop the assault, Miller punched West in the face several times. Cenicola also struck West in the face and in the side.

During the interaction, West described feelings of "fighting for [his] life." 3 VRP at 519. West could recall being pushed and falling straight back towards the ground. West remembered reaching out, and trying to brace himself by grabbing for whatever he could reach. Although West "blanked out" during the interaction with officers and could not recall punching the officers, West

acknowledged that he "probably was kicking." *Id.* at 518, 521. West stopped fighting officers after Miller "landed" a punch. 2 VRP at 392. Officers were then able to place West in handcuffs.

During the altercation in the parking lot between West and the officers, Officer Ryan Warner was inside viewing surveillance footage related to the shooting, which was the crime under investigation at that time. Warner was viewing the footage of the shooting to determine "who fired the gun, who's got the gun, and where [the suspect] was." 1 VRP at 15. While reviewing the live footage, Warner noticed that an altercation was occurring in the parking lot and also heard information about the altercation on his radio. Warner left the bar to assist the other officers involved in the altercation. Once the altercation was over, Warner returned to the bar to continue reviewing footage of the shooting. Because Warner was assigned to the shooting investigation, he only reviewed the footage of the shooting and not the altercation with West. The record contains no evidence that Warner believed, at the time he was viewing the footage, that West was going to be charged with a criminal offense.

The bar was unable to provide Tacoma police the video footage that night.[5] Detective James Buchanan was the detective assigned to investigate the shooting that occurred at the bar. When Buchanan reviewed the report prepared by Warner related to the surveillance footage, he realized the footage of the shooting had not been collected and he returned to the bar to collect the video. Buchanan retrieved only the footage related to the shooting and did not collect any footage related to the altercation between West and the officers.

---

[5] Warner testified that it was the bar's practice to burn a CD with the requested footage and provide it to the police at a later time.

West was charged with three counts of third degree assault against Cenicola, Breskin, and Miller.

2. *Motion to Dismiss*

Prior to trial, West moved to dismiss the charges against him. In his motion to dismiss, West argued that the State failed to "preserve, and/or produce, potentially exculpatory video surveillance evidence of which was in the state's control." Clerk's Papers (CP) at 21.

In its response to West's motion, the State argued that there was "no reason to believe that video surveillance of [the] incident would have been exculpatory" and that "based upon the multiple law enforcement witnesses and incident reports, any video surveillance [was] likely to have been inculpatory." *Id.* at 49. The State asserted that "[a]ny potential failure to collect the surveillance video showing the [incident] . . . was not done in bad faith." *Id.* at 54.

In explaining why he did not collect the video of the altercation, Warner testified that he was assigned to investigate the shooting, which was a separate investigation than what occurred with West in the parking lot. Warner further explained that the officers responsible for investigating the altercation with West were capable of obtaining the video. The footage of the incident was never produced to the trial court before it was apparently erased. The record does not show when the bar deleted videos of the incident or what the bar's retention policy required.

Prior to ruling on West's motion, the trial court explored West's attempts to secure the surveillance video. Defense counsel explained that attempts to secure the footage began within a month of West's case being charged.[6] Defense counsel further explained that the defense

---

[6] The State asserts that West first requested the videos in October 2021.

investigator tried to obtain the footage directly from the bar but the bar would not cooperate or return the investigator's call. During this same time period, defense counsel said she was having conversations with the prosecutor asking to be provided with the video. Defense counsel considered bringing a motion to compel, but instead filed a public records request for the video in April 2021. When defense counsel received the video in May 2021, she instantly discovered that it depicted only the shooting and not the incident involving West. Although the trial court asked whether the video footage had been deleted, defense counsel stated that she did not know. The trial court did not ask the State about the current status of the footage.[7]

The trial court concluded that the surveillance video was not material exculpatory evidence; however, it was potentially useful evidence. The trial court further concluded that although the Tacoma Police Department was negligent in failing to collect the surveillance video, West did not meet his burden in establishing that the police acted in bad faith. In the absence of a showing of bad faith, the trial court denied West's motion.

3. *The State's Closing Argument at Trial*

During closing argument, the prosecutor made the following argument to which West timely objected:

> [Defense counsel's] job is to get up there and offer a defense of her client, and she does that by being an illusionist. Her job is to get you to look at other things to distract you from what is actually going on here.

4 VRP at 667. The trial court sustained defense counsel's objection.

---

[7] Although it appears both the parties and the trial court assumed the footage had been deleted by the bar at some point prior to the hearing, the record is silent on the status of the footage. For purposes of this appeal, we note that nowhere in this record does anyone bearing personal knowledge of the matter say the video was destroyed. However, because this issue is not germane to our analysis, we accept the parties' assumption that the footage was destroyed.

After the jury retired for deliberations, the trial court further explained its reasoning in sustaining the objection, stating that caselaw makes "it very clear that disparaging opposing counsel or implying that an argument is slight [sic] of hand, which is exactly what was engaged in, is misconduct. As such, that is why [West's objection] was sustained." *Id.* at 676.

*4. Verdict and Sentencing*

In March 2022, a jury found West guilty of three counts of third degree assault. The trial court sentenced West to 30 days of confinement on each count to run concurrently using the first-time offender waiver pursuant to RCW 9.94A.650.[8] The trial court converted West's confinement to 240 hours of community restitution (service).

West appeals.

## ANALYSIS

West argues that the trial court erred in denying his motion to dismiss for governmental misconduct. Central to his claim is that the Tacoma Police Department had a duty to obtain and preserve evidence, in this case surveillance video footage, that was created and held by a private party. West further argues that he received ineffective assistance of counsel where counsel failed to request a missing evidence jury instruction. Finally, West argues that the State's remarks during closing argument, referring to defense counsel as an "illusionist," amount to prosecutorial misconduct requiring reversal.

### I. FAILURE TO OBTAIN EVIDENCE

---

[8] RCW 9.94A.650 was amended in 2022. *See* LAWS OF 2022, ch. 16, § 6. Because this amendment does not impact our analysis, we cite to the current version of the statute.

West argues that he was deprived of due process where the trial court "fail[ed] to grant the motion to dismiss on the basis that the video was material exculpatory evidence, or alternatively, that the State engaged in bad faith by failing to collect and preserve the video of the altercation between [West] and the officers." Br. of Appellant at 36. We disagree.

*1. Legal Principles*

Washington's "due process clause affords the same protection regarding a criminal defendant's right to discover potentially exculpatory evidence as does its federal counterpart." *State v. Wittenbarger*, 124 Wn.2d 467, 474, 880 P.2d 517 (1994). Under the Fourteenth Amendment, a criminal defendant must be afforded "a meaningful opportunity to present a complete defense." *Id.* Accordingly, the State has a duty to disclose and preserve material exculpatory evidence in its possession. *Id.* at 475. The State has no duty, however, to *collect* exculpatory evidence. *See State v. Armstrong*, 188 Wn.2d 333, 345, 394 P.3d 373 (2017). The police do not have " 'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.' " *Wittenbarger*, 124 Wn.2d at 475 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)).

We review "an alleged violation of the constitutional right to due process de novo." *State v. Johnston*, 143 Wn. App. 1, 11, 177 P.3d 1127 (2007).

*2. Application*

Here, West attempts to frame his argument as a preservation issue; however, such an argument fails because the State does not have a duty to collect evidence nor can it preserve evidence it never possessed. *See Armstrong*, 188 Wn.2d at 345. West cites no authority

establishing a duty to collect. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court . . . may assume that counsel, after diligent search, has found none"). Instead, our caselaw establishes that officers have no duty to search for exculpatory evidence or pursue every angle on a case. *Armstrong*, 188 Wn.2d at 345; *State v. Jones*, 26 Wn. App. 551, 554, 614 P.2d 190 (1980). Furthermore, where the State never had possession of the evidence, it follows that there is no duty to preserve the evidence. The surveillance footage was in the possession of a third party, and was never collected by the officers. In the absence of such a duty, West's claim necessarily fails.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

West argues that he received ineffective assistance of counsel where counsel failed to request a "missing evidence" jury instruction. Br. of Appellant at 36. West contends that "had the jury been so instructed, [West's] testimony that he did not hit the police but was instead grabbed by officers, fell backwards and flailed in an attempt to defend himself would have been strongly corroborated by the [adverse] inference" from the State's failure to produce the video. *Id.* at 41. We disagree.

### 1. Legal Principles

The United States Constitution and our state constitution guarantee a right to effective counsel at all stages of a criminal case. WASH. CONST. art. I, § 22; U.S. CONST. amend. VI. There is a strong presumption that counsel's assistance was effective. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To establish ineffective assistance of counsel, a defendant must show that counsel's performance was (1) deficient, and (2) resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Performance is deficient

if it falls below an objective standard of reasonableness based on all the circumstances. *Id.* at 687-88. Prejudice ensues where there is a reasonable probability that the result of the proceeding would have differed had counsel not performed deficiently. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 36, 296 P.3d 872 (2013), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). If a defendant fails to show either prong of the ineffective assistance of counsel test, this court's inquiry need go no further. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004).

Where an ineffective assistance of counsel claim "is based on counsel's failure to request a particular jury instruction, the defendant must show he was entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice." *State v. Classen*, 4 Wn. App. 2d 520, 539-40, 422 P.3d 489 (2018).

A defendant is entitled to a jury instruction that supports their theory of the case where "there is substantial evidence in the record supporting [that] theory." *State v. Powell*, 150 Wn. App. 139, 154, 206 P.3d 703 (2009).

"The missing evidence instruction derives from the missing witness doctrine." *State v. Derri*, 17 Wn. App. 2d 376, 404, 486 P.3d 901, *review granted in part*, 198 Wn.2d 1017, 497 P.3d 389 (2021), *aff'd but criticized*, 199 Wn.2d 658, 511 P.3d 1267 (2022). The instruction provides for a permissive inference that when evidence is within the control of a party " 'whose interest it would naturally be to produce it' " and the party fails to produce it, the jury may infer that the evidence would be unfavorable to the party. *Id.* (internal quotation marks omitted) (quoting *State v. Blair*, 117 Wn.2d 479, 485-86, 816 P.2d 718 (1991)). Under the closely related missing witness doctrine, a party is not entitled to a missing witness instruction where the witness is equally

available to both parties. *Blair*, 117 Wn.2d at 490. A missing evidence instruction "is not warranted when the evidence is unimportant or merely cumulative, or when its absence is satisfactorily explained." *Derri*, 17 Wn. App. 2d at 404.

### 2. Application

Here, West is unable to establish that he was entitled to a missing evidence jury instruction, and thus is unable to demonstrate prejudice. The missing evidence instruction applies where evidence " 'is within the *control* of a party whose interest it would naturally be to produce it.' " *Id.* (internal quotation marks omitted) (quoting *Blair*, 117 Wn.2d at 485-86). This evidence was never in the control of the State, and even if it was West has not shown that he did not have equal access to this evidence. Although West's counsel advised the trial court that the bar did not respond to their inquiries about the footage, the record does not reveal any attempt on counsel's part to issue a subpoena for production or otherwise seek the assistance of the court in obtaining this footage.[9] While it is true that the State viewed surveillance footage on the night of the incident that showed the altercation between West and the officers, the record does not show that the State was in control of this footage or that West did not have an equal opportunity to view or obtain it.

Because West was not entitled to a missing evidence instruction, he cannot show that one would have been given had it been requested. Moreover, he cannot show that the jury's verdict would have been different had the jury received such an instruction in light of the substantial evidence of his guilt presented to the jury. West's ineffective assistance of counsel claim fails.

### III. PROSECUTORIAL MISCONDUCT

---

[9] *See* CrR 4.8(b).

West argues that the prosecutor's remarks during closing argument were improper and prejudicial. West contends that the prosecutor "disparaged defense counsel during rebuttal closing argument by" referring to defense counsel as an " 'illusionist' " whose " 'job is to get [the jury] to look at other things to distract [them] from what is actually going on here.' " Br. of Appellant at 43. West argues that because "there is a substantial likelihood serious misconduct impacted the result at trial, reversal is required." *Id.* at 45.

The State concedes that the prosecutor's comment was "arguably improper given that it could be interpreted as impugning the defense attorney." Br. of Resp't at 35. However, the State argues that West did not "meet his burden of demonstrating that the prosecutor's brief, isolated comment had a substantial likelihood of affecting the jury's verdicts."[10] *Id.* We agree.

*1. Legal Principles*

Under the Sixth and Fourteenth Amendments to the United States Constitution and under article I, section 22 of the Washington Constitution, a criminal defendant is guaranteed the right to a fair trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012) (plurality opinion). Prosecutorial misconduct threatens a defendant's constitutional right to a fair trial. *Id.* at 703-04.

---

[10] The State also argues that it is not enough for West to have simply lodged a timely objection to the prosecutor's remarks, but that he was also required to ask for a curative instruction in order to preserve this claim. The State provides no meaningful argument in support of its assertion of waiver and cites no authority in support of this contention. Rather, the State appears to rely on the portion of our analysis, in cases in which *no* objection is lodged, that examines whether a curative instruction could have obviated any prejudice caused by the improper remarks. It does not follow that a defendant must request a curative instruction in order to overcome waiver. Moreover, we have found no authority holding that a defendant must both timely object *and* formally request a curative instruction in order to preserve a prosecutorial misconduct claim for appeal.

To prevail on a claim of prosecutorial misconduct, West must show " 'that the prosecutor's conduct was both improper and prejudicial.' " *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). First, a defendant must show that the prosecutor's statements were improper. *Id.* Although a prosecutor enjoys wide latitude in making their closing arguments, it "is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." *Id.* at 448, 451.

Second, if the prosecutor's statements were improper, we must determine whether the statements were prejudicial. *State v. Corbett*, 158 Wn. App. 576, 594, 242 P.3d 52 (2010). The standard of review employed to determine whether the defendant was prejudiced turns on whether the defendant objected to the prosecutor's statement at trial. *See id.* Where, as here, the defendant objected at trial, the defendant must establish that " 'there is a substantial likelihood the instances of misconduct affected the jury's verdict.' " *Id.* (internal quotation marks omitted) (quoting *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003)).

In "reviewing a claim that prosecutorial misconduct requires reversal, the court should review the [prosecutor's] statements in the context of the entire case." *Thorgerson*, 172 Wn.2d at 443.

*2. Application*

Here, West objected to the prosecutor's argument, and the State concedes that the prosecutor's statement describing defense counsel as an "illusionist" were improper. We accept the State's concession on this point. By referring to defense counsel as an "illusionist" who was attempting to "distract" the jury, the prosecutor's statement exceeded the scope of acceptable

conduct. 4 VRP at 667. Similar to the prosecutor's statements in *Thorgerson*, the prosecutor's statement here carries implications of wrongful deception and dishonesty. 172 Wn.2d at 452.

Nonetheless, West does not meet his burden in demonstrating that the prosecutor's improper statement, when reviewed in the context of the entire case, was substantially likely to have affected the jury's verdict. The jury heard ample officer testimony concerning the injuries sustained as a result of their interaction with West. Cenicola described being "sucker punch[ed]" in the face. 2 VRP at 454. Breskin recounted being punched in the jaw and ear. And Miller described being "punched in the head a couple of times." *Id.* at 387. The jury also heard West's testimony corroborating that an altercation occurred in which West "blanked out" but recalled "struggling, fighting for [his] life." 3 VRP at 516-19. In light of the evidence presented to the jury, West has not demonstrated that the prosecutor's isolated statement during closing arguments was substantially likely to result in prejudice affecting the jury's verdict.

Accordingly, we conclude that, although improper, the prosecutor's statement does not rise to the level of prosecutorial misconduct requiring reversal or dismissal.

## CONCLUSION

We hold that (1) the trial court did not err in denying West's motion to dismiss for governmental misconduct, (2) West did not receive ineffective assistance of counsel where counsel did not request a missing evidence jury instruction, and (3) the State's remark during closing argument referring to defense counsel as an "illusionist," while improper, does not amount to prosecutorial misconduct. Accordingly, we affirm West's conviction.

No. 56817-9-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

GLASGOW, C.J.

VELJACIC, J.